### ELLIOTT CO. v. ROBERTSON.

(District Court, W. D. Pennsylvania. January 23, 1915.)

No. 4.

1. PATENTS ⟐⟹328—VALIDITY—ROTARY ENGINE.
     The McIntosh patent, No. 813,815, for a rotary engine, *held* void for anticipation and prior use.

2. PATENTS ⟐⟹328—VALIDITY—ROTARY MOTOR.
     The Van Ormer patent, No. 969,010, for a rotary motor, *held* void for anticipation and prior use.

3. PATENTS ⟐⟹328—INFRINGEMENT—TURBINE.
     The Elliott & Faber patent, No. 983,032, for a turbine, *held* to relate to a different art from the one involved in the suit, and therefore not infringed.

⟐⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. **PATENTS ⊚⇒328—VALIDITY—ROTARY MOTOR.**
    The Elliott patent, No. 1,045,134, for a rotary motor, with respect to the air space at the rear end of the shaft and the vent leading therefrom claimed therein, *held* void for anticipation; also not infringed.

5. **PATENTS ⊚⇒328—VALIDITY—ROTARY MOTOR.**
    The Elliott, Mills & Holt patent, No. 1,019,771, for a rotary motor, as respects the air chamber and vent leading therefrom to the exhaust, *held* invalid for anticipation and lack of invention.

6. **PATENTS ⊚⇒328—VALIDITY—ROTARY MOTOR.**
    The Mills & Conn patent, No. 1,053,055, for a rotary motor, claim 10, covering the introduction of lubricant into the motor with the motor fluid, *held* void for anticipation.

In Equity. Suit by the Elliott Company against John F. Robertson, trading as the John F. Robertson Company. On final hearing. Decree for defendant.

Bakewell & Byrnes, of Pittsburgh, Pa., for plaintiff.

Gifford & Bull, of New York City, and Synnestvedt & Bradley, of Pittsburgh, Pa., for defendant.

ORR, District Judge. This patent suit is before the court for decision after trial. The plaintiff charges the defendant with the infringement of plaintiff's rights under six several patents, the title to all of which is conceded by defendant to be in the plaintiff. The several patents, with the number and date when issued by the United States, with the names of the patentees respectively, and the name of the apparatus to which each applies, is listed in the bill as follows:

No. 813,815, to R. S. McIntosh, February 27, 1906, for rotary engine.

No. 969,010, to H. Van Ormer, August 30, 1910, for rotary motor.

No. 983,032, to Elliott & Faber, January 31, 1911, for turbine.

No. 1,019,771, to Elliott, Mills & Holt, March 12, 1912 for rotary motor.

No. 1,045,134, to W. S. Elliott, November 26, 1912, for rotary motor.

No. 1,053,055, to Mills & Conn, February 11, 1913, for rotary motor.

All of said patents relate to apparatus especially adapted to removing scale from boiler tubes. The immediate factor in the removal of the scale is a cleaner head of some accepted form, which is fastened to a shaft extending through the motor, and which revolves with said shaft as said shaft is made to revolve by the operation of the motor. The shaft is made to operate by the pressure of air or steam, or some fluid forced through the end of the motor or turbine opposite to that to which the cleaner head is attached. In a turbine the motor fluid is pressed through a diaphragm, and in such way as to operate directly against a turbine wheel, thereby causing it to move with rapidity and force enough to move the shaft which is attached to the turbine wheel, which shaft is also the shaft to which the cleaner head is attached. In the rotary motors, the air or steam is forced along one side of a cylindrical chamber, which is concentric to the motor and concentric to the shaft to which the cleaner head is attached, and is forced into such piston chamber through ports from the inlet passage. The air forced thus into the piston chamber presses against a blade or blades extended

longitudinally therewith and inserted into longitudinal slots in the shaft in such way as to have a lateral movement as the shaft revolves, thereby causing the space in the cylinder around the shaft to be always divided into two or more longitudinal divisions. To relieve the pressure in the cylinder which would be constant if there were no exhaust, a longitudinal outlet is made from ports which extend from the cylinder. The inlet ports and the exhaust ports are less than 180° from each other in one direction. The pressure of the air or steam against a blade forces it and the shaft in the direction of least resistance until the blade passes the exhaust ports, and as it passes the exhaust ports that pressure is relieved, but a new pressure begins by another blade having reached the position where the pressure from the inlet ports continues the revolution of the shaft. Of course, there are bearings provided for the shaft and means by which the apparatus may be lubricated.

It is urged by the plaintiff that the six patents in suit represent successive steps in the attainment of the first successful rotary air motor. In the consideration of them severally, it will be unnecessary to dwell upon the particular elements of each claim involved. Many of the elements are found in earlier patents, but to emphasize the importance given them by the plaintiff it is well to notice the special features of each of the patents.

Patent No. 813,815, to McIntosh, embraces a longitudinally extending exhaust passage in the wall of the piston chamber.

No. 969,010, to Van Ormer, contemplates that the centers of the admission and exhaust ports leading from the respective passages should be less than 180° from each other, and that there should be one piston blade extending through the shaft.

No. 983,032, to Elliott & Faber, emphasizes a casing within which the other parts of the motor are contained and may be held against a rearward movement and from which the other parts may be removed rearwardly.

The next two patents have been designated as the vent hole patents. While No. 1,045,134, to Elliott, is the later patent, it was based upon an earlier application than patent No. 1,019,771, to Elliott, Mills & Holt. Both patents provide for an air chamber at the rear end of the piston shaft, and means for venting said space. The means for venting the space in the Elliott patent was an opening to the outside air. The means of venting in the other patent is by an opening from said space to the exhaust passage.

No. 1,053,055 embraces practically the same thing as the two patents last mentioned, with the addition of means for introducing lubricant into the motor chamber and causing the same to mix with the motor fluid, whereby some of the lubricant will be carried to the rear bearing by pressure leakage.

In the plaintiff's bill of particulars, as amended, it is found that the plaintiff relies upon the following claims of the several patents in suit:

Claim 2 of patent No. 813,815.
Claim 4 of patent No. 969,010.
Claims 35 and 36 of patent No. 983,032.
Claims 1, 2, 3, 4, 7, and 8 of patent No. 1,019,771.

Claims 1, 2, 3, 5, 6, 8, 9, 10, 11, and 16 of patent No. 1,045,134.

Claim 10 of patent No. 1,053,055.

[1] Taking up these several claims in their order, claim 2 of patent No. 813,815 is as follows:

> "In a rotary engine, a cylinder or casing having therein a longitudinal, eccentric piston chamber, longitudinally extending inlet and exhaust passages in the wall of said chamber, and communicating therewith, one end of said chamber being closed by a transverse partition wall around which the inlet port extends, and which forms a seat for a piston bearing, and a piston in said chamber, substantially as described."

A careful study of this patent and of the claim thereof in litigation has satisfied the court that it lacks invention. Every element of that claim, with the exception of one, is found in a prior United States patent to Laurence E. Troxler, No. 695,896, under date of March 18, 1902. The only thing that is not found in Troxler's patent, which is found in the claim now under consideration, is the exhaust passage and the ports leading thereto from the piston chamber. Troxler's means of exhaust was by an opening from the piston chamber directly through the forward head of the cylinder. With the inlet passage and its ports constructed within the walls of the cylinder adjacent to the piston chamber, the conclusion is irresistible that an exhaust passage, with ports to it from the piston chamber, could also be made. So far as the evidence in this case discloses, there is no advantage in the exhaust passage of the patent now under consideration over the opening in the Troxler patent. It should not be found, and the court cannot find, that there was any invention in making the exhaust passage embraced in the patent No. 813,815.

The patent under consideration is not only found anticipated by the prior patent to Troxler, but, as will be seen hereafter, was anticipated by prior use.

[2] Taking up next the Van Ormer patent, No. 969,010, claim 4, which is involved in this litigation, is as follows:

> "4. In a motor, a cylinder having a piston chamber therein, with circumferential admission and exhaust ports communicating therewith, the center of said ports being less than 180° from each other in one direction, the cylinder having heads provided with bearings for a piston shaft, and a rotary piston journaled in said heads and having a single slot extending diametrically therethrough to seat a piston blade, substantially as described."

There is nothing in this claim which is not found anticipated, although the language is not found in prior patents. The circumferential admission and exhaust ports communicating with the piston chamber have already been considered in commenting upon the McIntosh patent. The fact that the centers of said ports are stated to be less than 180° from each other in one direction is apparent from Troxler, and from the fact that the piston chamber is eccentric with the cylinder in the motor of Troxler. The mere assertion that there is intended a single slot to seat a piston blade does not indicate invention. The patent shows that the single slot extends diametrically through the shaft, and the single piston blade extending through the shaft is the equivalent of two blades, one on either side of the shaft. This construction indicates

a mere mechanical arrangement of features of the prior patents. There is no evidence in the case that more efficient results were obtained.

It is doubtful, from the evidence in this case, whether either the McIntosh motor or the Van Ormer motor were really useful motors, and it could be found as a fact, from the evidence on the part of the plaintiff, that they were not. Evidence, however, on the part of the defendant, was introduced that motors containing all the elements of both the McIntosh and Van Ormer patents were made, sold, and successfully operated by purchasers more than two years prior to the applications for either of the patents. As early as 1899, Henry Van Ormer, then employed as chief engineer of the power station of the Hartford Street Railway Company, made a motor embodying all the features of the McIntosh and Van Ormer patents, which was successfully used for some months in the cleaning of boiler tubes. Some time afterwards, in 1901, he entered into a business arrangement with one Bushnell for the manufacture and sale of motors under the partnership name of Hartford Tube Cleaner Company. In the spring of 1902 Bushnell sold his interest to A. E. Jensen, and Jensen and Van Ormer continued the manufacture and sale of tube cleaners under that name. Several motors were made by that company, were sold, and were successfully used. Some of these motors were used for years—one, made in 1900 or 1901, by the Hartford Street Railway Company; another, made in the spring of 1902, and sold to the Hartford, Manchester & Rockville Tramway Company, which was used by that company successfully for years in cleaning boiler tubes. Another was sold at Norwich, Conn., in the summer of 1902 to the Beebe & Holbrook division of the American Writing Paper Company, at Holyoke, Mass., and was used by that company for five years, being the only tube cleaner used by that company within that period.

Testimony was given, not only by Jensen and Van Ormer, but by other witnesses, who either took part in the manufacture of motors for the Hartford Tube Cleaner Company, or used said motors in the cleaning of boiler tubes, or saw them used by others. The evidence does not justify a finding that the Van Ormer motor of 1899 was a mere experiment and subsequently abandoned, but, on the contrary, leads to the conclusion that the Van Ormer device, as expressed in the various motors, was in public use and on sale in this country more than two years prior to the application for any of the patents in suit.

Counsel for the plaintiff attempted to impeach the testimony of Van Ormer and Jensen in the present case by offering in evidence an affidavit of Van Ormer and testimony given by him and Jensen in interference proceedings in the Patent Office. In other words, they offered to show that those witnesses, at another time and place and under other circumstances, made statements different in some respects from the testimony given by them in this present litigation, and this without calling to the attention of the witnesses the time, place, and circumstances under which the other statements were made as fully as should have been done. The court admitted the offers by the plaintiff of the affidavit and testimony in the proceedings in the Patent Office, and believes that there was error in having done so, because it does not appear in this case that the witnesses had full and sufficient opportunity to ex-

plain why the statements made in the Patent Office proceeding were made.

Inasmuch as the error was committed and the evidence is in this record, the same has been considered. Less weight, however, is given to the proof of the statements in the Patent Office proceeding than would be given to it, had the witnesses had full opportunity to explain such discrepancies as appear to have existed in their respective examinations. But the testimony of others and the evidence of physical exhibits, together with the evidence of Van Ormer and Jensen, although perhaps slightly impeached, lead to the conclusion that the Van Ormer device, as manufactured, sold, and used by others, was a prior use, which invalidated the McIntosh and Van Ormer patents in suit.

[3] Taking up the patent to Elliott & Faber, No. 983,032, we find that claims 35 and 36 are relied upon. These claims are as follows:

"A rotary motor having a casing, a revoluble motor element within the casing, a shaft supporting said motor element and extending forwardly and rearwardly therefrom, the forwardly projecting portion of the shaft having a bearing within the casing, a ported admission member carrying a bearing for the rearwardly projecting portion of the shaft, and means whereby said member is normally held against rearward movement, said member being removable rearwardly from within the casing through its open rear end when the securing means are removed, substantially as described.

"A rotary motor comprising a casing, a front bearing therein, a ported stationary member closing the rear part of the casing and containing a shaft bearing, said ported member being removable through the rear end of the casing, a shaft journaled in the bearings, a rotary element carried by the shaft and located between the bearings, and clamping means for locking the ported stationary member in place, substantially as described."

It is with difficulty that the application of this patent to the present litigation is found. As already stated, the patent is for a turbine, which is, of course, a motor in its broad sense, but which is, nevertheless, limited to specific construction in certain respects. The motor element specified in the claim is the turbine wheel, by the revolution of which the shaft also revolves. That motor element or turbine wheel is made to revolve because of the action against it of a motor fluid forced through peculiarly constructed openings in a diaphragm, which by their arrangement, in connection with the openings through the turbine wheel, cause the latter to revolve. The diaphragm is immovable during the operation of the motor, and contains a bearing for the rearwardly projecting portion of the shaft. In the claims of the patent now under consideration, such diaphragm is designated as the ported admission member. If this patent is relied upon because of its features of locking the ported stationary member in place, the defendant cannot be held to have infringed any rights of the plaintiff under said patent, because none of the suggestions of the patent with respect to clamping means for locking the ported stationary member in place are used by the defendants in the manufacture of their motor. If this patent be offered because a casing is provided for in the claims, there can be no infringement found, because a casing inclosing movable parts is old, and because the casing used by the defendants is not suggested anywhere in this patent. What has been said with respect to the casing

may also be said with respect to the statements in the claims that the ported admission member may be removed rearwardly from the casing.

[4] Taking up next the Elliott patent, No. 1,045,134, we find that the claims thereof in dispute are as follows:

"1. In a rotary motor, a piston shaft, a rear bearing for said shaft, an air space adjacent to said bearing and means for venting said space, substantially as described.

"2. A rotary motor having an air space at the rear end of the piston shaft, and means for venting said space, substantialy as described.

"3. In a motor, a piston shaft and an air chamber adjacent to one of the bearings of said shaft, and having a vent opening leading therefrom, substantially as described."

"5. A rotary motor having a chamber containing a motor element, a shaft on which said element is mounted, said shaft having front and rear bearings, the front end of the shaft extending beyond the front bearings for attachment to a tool, and the rear bearing terminating and being inclosed within the rear end of the motor, means for admitting working fluid to the cylinder through its rear end, and means for relieving the accumulation of fluid at the rear end of the shaft, substantially as described.

"6. A rotary motor having a fluid supply pipe connected at its rear head, and having a longitudinally extending port leading to the cylinder, a motor shaft having its axis parallel to the axis of the supply pipe, the rear bearing for said shaft being located in front of the supply pipe connection, and there being an air space adjacent to the end of said shaft, substantially as described."

"8. A rotary motor having a connection for fluid supply at one end, a shaft for the motor having a bearing terminating in front of the supply connection, an air space located between the supply connection and the rear end of the shaft, and means for venting said space, substantially as described.

"9. A rotary motor having a piston shaft and a socket bearing for the rear end of said shaft, together with means for venting said bearing to prevent an accumulation of pressure therein, substantially as described.

"10. A rotary motor having a shaft extending rearwardly within a bearing, and means for venting pressure which accumulates at the rear end of the shaft, substantially as described.

"11. A rotary motor having front and rear bearings, a motor chamber between the bearings, a supply connection at the rear of the rear bearings, a passageway leading from the supply connection to the motor chamber, and an opening to the atmosphere at the rear end of the shaft, substantially as described."

"16. A rotary motor having a rear ported closure containing a shaft bearing, said bearing having a vent opening leading to the atmosphere, substantially as described."

It is claimed by the plaintiff that the Elliott patent, No. 1,045,134, was the result of Elliott's discovery that the pressure of the motor fluid in the cylinder would extend into the bearing at the rear end of the shaft and cause a forward pressure of the shaft against the forward head, which forward pressure so increased the friction as rendered motors made prior to that time of use for limited periods only, and that Elliott, by providing the chamber and the vent in his patent, furnished a means for relieving such pressure, thus enabling the motors to be operated for indefinite periods.

Elliott's view of his own invention is expressed by his testimony in certain interference proceedings, to which his attention was called in the case at bar. He stated that, in order to be effective for a relief port, the vent would have to communicate with the rear end of the shaft. He further said in such testimony that, if there were no space at the rear of the shaft, the vent port would communicate with a small

percentage of the shaft's surface, and after a little wear the vent port would not communicate at all with the rear end of the shaft, and thus permit the air pressure to accumulate and increase the friction on the front and thrust. His conception of his invention, at the time of his testimony in the proceeding in the Patent Office, must be deemed to have been as correct at least as when he testified in the present case. In addition to this, according to the testimony of Elliott and the witness Faber, Elliott had caused to be prepared drawings of a motor in December, 1903, in which an air space and a vent therefrom were made, just as contemplated in the Elliott patent, which was applied for on January 20, 1908. That Elliott delayed for four years in making application for his patent is a significant fact, which, in connection with the facts that he had a motor made according to the drawings of December, 1903, and used same for but a short time, satisfies the court that Elliott was not of the opinion that he had made an important discovery.

In the meantime P. J. Darlington filed an application on June 17, 1907, upon which patent No. 1,041,040 was issued October 15, 1912, in which there is an air chamber, *12*, at the rear end of the piston shaft, from which chamber a vent or an escape, *34*, opens to the atmosphere through the rear head.

Again, on September 24, 1907, Mills & Conn made application, upon which patent No. 1,053,055 was issued February 11, 1913, which patent is in suit in this case. In the Mills & Conn patent there is a space at the rear end of the piston shaft and an opening therefrom to the outside air. It is true this last patent, when issued, appears to have been assigned to the Liberty Manufacturing Company, now the Elliott Company, the plaintiff in this suit.

In view of Elliott's delay and these two applications prior to his application, the court is constrained to hold that Elliott lost whatever rights he might have had, had he promptly proceeded to procure the advantages which he claims belonged to him by reason of his conception of the air space and the vent. The court has reached this conclusion after careful consideration of the evidence introduced as to the various proceedings in the Patent Office, which were much involved.

[5] Coming now to the other vent hole patent of Elliott, Mills & Holt, No. 1,019,771, we find the claims therein as follows:

"1. In a rotary air motor, a rear head provided with a bearing for a piston shaft, and also provided with a chamber adjacent to and communicating with the bearing, and an escape passage communicating with the said chamber at its rear end, and thence leading through the cylinder wall and opening to the atmosphere at the front end portion of the motor, whereby oil and air escaping from said chamber are discharged forwardly and away from the operator, substantially as described.

"2. In a rotary motor, a removable rear head provided with a rear bearing for a piston shaft, said head having an inclosed chamber at the rear end of said shaft, and an exhaust passage leading from said chamber to the exhaust port of the motor, substantially as described.

"3. In a rotary motor, a cylinder having a longitudinally extending exhaust port, and a removable rear head, said head having a bearing for a piston shaft, and an inclosed chamber at the rear end of the piston shaft, said chamber communicating with the exhaust port by an exhaust passage, substantially as described.

"4. In a rotary motor, a rear bearing for the motor shaft, an inclosed chamber at the end of the motor shaft, and an exhaust port or passage connecting said chamber with the exhaust port of the motor, substantially as described."

"7. In a rotary motor, a cylinder having front and rear heads, and longitudinally extending admission and exhaust ports, and a piston shaft journaled in said heads, the rear head having a space or chamber therein adjacent to the end of said shaft, said rear head having a port leading therethrough in line with the admission port of the cylinder, and also having a port or passage connecting the space or chamber therein with the longitudinally extending exhaust port of the cylinder, substantially as described.

"8. In a rotary air motor, a rear head provided with a bearing for a piston shaft, and also provided with a chamber adjacent to said bearing, the bearing also having a surrounding air space which communicates with the chamber, and a vent passage communicating with the said chamber and leading forwardly therefrom and discharging to the atmosphere, substantially as described."

It has already been noticed that the only difference between this patent and the Elliott patent is that this patent contemplates that the vent shall lead from the air chamber to the exhaust passage at the rear end of the piston blade, whereas the Elliott patent contemplates that the air passage should lead to the outside air. There was no invention in changing the vent from the construction of the Elliott patent to that of the Elliott, Mills & Holt patent.

[6] Taking up now the Mills & Conn patent, No. 1,053,055, we find that claim 10 only is involved, which is as follows:

"10. In a rotary motor, a cylinder, a motor element supported on bearings beyond the ends of the cylinder, the rear bearing being inclosed, means for permitting the escape of pressure leaking from the motor chamber through the rear bearing, and means for introducing lubricant into the motor chamber and causing it to mix with the motor fluid, whereby some of the lubricant will be carried to the rear bearing by the pressure leakage, substantially as described."

The introduction of lubricant into motors with the motor fluid is old, and therefore that specific feature of the Mills & Conn patent was not secured to the patentees by that patent.

As a summary of the conclusions reached by the court with respect to the patents in suit, it is well to restate them as follows:

The McIntosh patent, No. 813,815, is invalid, because of the prior patent to Troxler, No. 695,896, and because of the prior use.

The Van Ormer patent, No. 969,010, is invalid, because of the prior patent to Troxler, No. 695,896, and the prior patent to McIntosh, No. 813,815, and because of prior use.

The Elliott & Faber patent, No. 983,032, relates to a different art. The court does not determine whether it is a valid patent or not, but does find that it has no bearing on the question of the adoption by the defendant of the features of the plaintiff's motor.

The patent to Elliott, No. 1,045,134, may be valid with respect to certain features not considered by the court, but does not protect the patentee with respect to the air space at the rear end of the shaft, and the vent leading therefrom, because such features were anticipated in the prior art by the Darlington patent, No. 1,041,040, and by the Mills & Conn patent in suit, No. 1,053,055.

The Elliott, Mills & Holt patent, No. 1,019,771, may be valid with respect to certain features thereof not considered, but with respect to

the air chamber and the vent leading therefrom to the exhaust the patentees did not secure any monopoly thereof, for the reason that the air chamber was anticipated as above stated, and for the reason that the change of the vent from the air chamber to the exhaust was not invention.

The Mills & Conn patent, No. 1,053,055, may be valid with respect to certain features, but with respect to the feature of introducing lubricant with the motor fluid the patentees did not secure any monopoly, for the same was old.

Taking up the question of infringement, we first observe that the motor of the defendant does not in outward appearance resemble the motor of the plaintiff. It has the piston chamber, the piston shaft and piston blades, and the inlet and exhaust ports in the wall of the piston chamber, all of which are found in the motors used by the Hartford Motor Company, and which, we have seen, the defendant has a right to use, not only because of the prior use, but also because of the Troxler patent. Defendant does not have the construction of the Elliott & Faber patent, No. 983,032. The parts of the motor are not arranged according to any suggestion found in that patent. The means for interlocking the parts are entirely different. The casing of the defendant's motor is a comparatively thin brass cylinder, which does not inclose the heads of the motor. It is not the casing of the Elliott & Faber patent. It has no air space at the end of the rear bearing of the piston shaft. It has, however, in the bearing of the piston shaft, about one-half way from the rear end of the piston chamber to the end of the shaft, a groove which is in shape and construction like the common oil groove used for years in bearings of many kinds, where lubricants are needed, and with which all who have any knowledge of machinery are acquainted. From that oil groove there is a vent to the exhaust passage of the motor.

The plaintiff has not convinced the court that the oil groove in defendant's construction is the equivalent to the air space at the end of the piston shaft, which was the duty of the plaintiff, if we assume for the moment that the vent hole patents in suit are applicable. It is a fact that the original lubrication of a new motor is by the introduction of oil into the piston chamber through the exhaust passage. After that the lubricant is introduced in operation through the medium of the motor fluid. The introduction of the oil into the exhaust passage before operating, when there was a hole from the exhaust passage to the oil groove around the piston shaft, would introduce lubricant to the piston shaft. Infringement cannot be found.

The bill must be dismissed at the plaintiff's cost. Let a decree be presented.